## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SADIA ABID,** | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BRISTOL-MYERS SQUIBB CO.,** | : | |
| **Defendant.** | : | **JULY 6, 2006** |

## COMPLAINT

### Jurisdiction and Venue

1.   This action is brought pursuant to and jurisdiction of this Court is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.   This action arises under Title VII of the Civil Rights Act of 1964, as amended, as codified as 42 U.S.C. § 2000e *et seq*., Conn. Gen. Stat. § 46a-60 *et. seq.* and state common law.

3.   Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Defendant is located in Connecticut and a substantial part of the conduct underlying plaintiff's claims occurred in Connecticut.

4.   Supplemental jurisdiction over Plaintiff's state law claims is invoked pursuant to 28 U.S.C. § 1367 as the claims arise out of the same transaction and occurrences as the Plaintiff's federal claims.

5.   Costs, expert witness fees and attorney's fees are sought pursuant to 42 U.S.C. §§ 1988.

6.   Plaintiff filed a timely claim with the Connecticut Commission on Human Rights and Opportunities and received a release of jurisdiction on April 21, 2006.

7.   Plaintiff requested a right to sue authorization from the Equal Employment Opportunity Commission.

PDF created with pdfFactory trial version www.pdffactory.com

**The Parties**

8.      Sadia Abid (hereinafter referred to as the "Plaintiff") is a forty-seven (47) year old female who was born in India and resides in Killingworth, Connecticut.

9.      Bristol-Myers Squibb Company (hereinafter referred to as the "Defendant"), maintains a principal place of business at 15 Research Parkway in Wallingford, Connecticut. Defendant employs more than 15 full-time employees and is an employer within the meaning of Title VII (42 U.S.C. § 2000) and the Connecticut Fair Employment Practices Act (Conn. Gen. Stat. § 46a-60, *et. seq.*).

**Preliminary Statement**

10.     Plaintiff seeks to recover damages and other relief as a result of the Defendant's violation of the Title VII, CFEPA and state common law.

**Facts**

11.     The Defendant is a global pharmaceutical company that, among other things, conducts research and development with respect to pharmaceutical products.

12.     Plaintiff was hired by the Defendant in or about June 1989 as an Associate Research Scientist II.

13.     In 1992, Plaintiff joined Defendant's Analytical Research & Development Department (hereinafter "ARD Department").

14.     Plaintiff's performance was consistently at or above company standards.

15.     Between 1992 and 1998 Plaintiff was promoted twice within the ARD Department.

16.     On or about April 1998, after a departmental reorganization, Plaintiff was assigned to a white female supervisor, Robyn Rourick.

17.     Robyn Rourick reported to a white male supervisor, Steven Klohr.

2

PDF created with pdfFactory trial version www.pdffactory.com

18.   In or about 1999, Ms. Rourick left the company and Plaintiff began reporting directly to Mr. Klohr.

19.   Before leaving the company, Ms. Rourick informed the Plaintiff that she had submitted a letter to Mr. Klohr recommending Plaintiff's promotion from her level D5 position to a level D6 position.

20.   Mr. Klohr never discussed this recommendation with the Plaintiff and never initiated any discussions with the Plaintiff about a possible promotion.

21.   When the Plaintiff raised the issue of promotion with Mr. Klohr, Mr. Klohr informed her that it was difficult to move from a level D5 position to a level D6 position.

22.   Despite this conversation and the comment made by Mr. Klohr, a white male employee was promoted from a D5 position to a D6 position.

23.   This white male employee had only been employed in the ARD Department for approximately 6 months at the time of this promotion.

24.   The Plaintiff had been employed in the ARD Department for longer than 6 months, with above average performance reviews and was not promoted to a D6 position.

25.   The Plaintiff had been at the D5 position since 1998.

26.   In or about September 1999, the Plaintiff began reporting to Anthony Alexander.

27.   Mr. Alexander reported directly to Mr. Klohr.

28.   On one occasion, Mr. Alexander made an inappropriate racial remark concerning one of the Plaintiff's subordinates, Tony Spears.

29.   The Plaintiff reported these comments to the Defendant as well as to Mr. Spears, an African-American male.

30.   After being informed about these remarks, Mr. Spears complained to Mr. Klohr and

PDF created with pdfFactory trial version www.pdffactory.com

demanded immediate remedial action.

31.   Although the Defendant took remedial action, Mr. Klohr informed the Plaintiff that she should not have informed Mr. Spears about Mr. Alexander's remarks.

32.   In or about April 2002, the responsibility of managing the ARD Department was transferred from Mr. Klohr to Qi Gao, a female of Asian descent.

33.   Ms. Gao began reporting to Gerry DiDonato, who was based in the New Brunswick, New Jersey office.

34.   Mr. DiDonato reported directly to Mr. Klohr.

35.   Immediately after Ms. Gao began managing the ARD Department, Plaintiff noticed Ms. Gao favored male employees, treated male employees with more respect and was more tolerant of male employees suggestions and concerns.

36.   In or about August 2002, the Defendant removed Plaintiff's supervisory responsibilities.

37.   Plaintiff had been performing such duties in an average or above average manner according to Defendant's performance reviews.

38.   Upon information and belief, the decision to remove Plaintiff's supervisory duties was in retaliation for her conduct in informing Mr. Spears about Mr. Alexander's inappropriate remarks.

39.   On or about September 25, 2002, Anna Byra-Grzegoczyk was hired by the Defendant as a manger in the ARD Department.

40.   Ms. Byra-Grzegoczyk's title was Senior Research Investigator (level D6).

41.   Ms. Byra-Grzegoczyk reported to Ms. Gao and became Plaintiff's direct supervisor.

42.   Shortly after she began reporting to Ms. Gao, Ms. Byra-Grzegoczyk started experiencing the same unequal treatment that the Plaintiff had experienced based on her gender.

PDF created with pdfFactory trial version www.pdffactory.com

43.    An example of Ms. Gao's unequal treatment of Ms. Byra-Grzegoczyk was her insistence on one-on-one meetings with Ms. Byra-Grzegoczyk on a weekly basis, where Ms. Byra-Grzegoczyk would be treated with hostility.

44.    Plaintiff was aware of this unequal treatment as she had experienced it first-hand prior to Ms. Byra-Grzegoczyk's arrival.

45.    In or about November 2002, Plaintiff asked the Associate Director of the ARD Department, Mr. DiDonato, for Defendant's guidelines on promotions.

46.    Mr. DiDonato informed the Plaintiff that no one within Defendant's company followed the promotion guidelines.

47.    When the Plaintiff asked Mr. DiDonato if she could quote him on that point, Mr. DiDonato became angry with her and stated that their conversation could either be civil or abusive.

48.    When the Plaintiff, in response to Mr. DiDonato's comments, stated that her conversations were always civil, Mr. DiDonato angrily left the Plaintiff's office.

49.    Prior to the meeting on or about November 2002, the Plaintiff was required to fill out her annual "Goals and Objectives" statement.

50.    As part of her "Goals and Objectives," Plaintiff stated "Request specific guidelines from managers in 1Q on what activities are required to be promoted to level 15.  Specific guidelines will eliminate any ambiguity on either side."

51.    After the Plaintiff's meeting with Mr. DiDonato, which concluded with Mr. DiDonato leaving her office angry, he instructed the Plaintiff to remove the sentences stated in Paragraph 49 from her annual "Goals and Objectives."

PDF created with pdfFactory trial version www.pdffactory.com

52. When Mr. DiDonato made this request, the Plaintiff's "Goals and Objectives" had already been approved and signed off by her direct supervisor, Ms. Byra-Grzegoczyk.

53. These sentences expressed the Plaintiff's desire to obtain information about the activities that were necessary for her to obtain a promotion.

54. Thereafter, Plaintiff was told, on several occasions, that she should not pursue her request for guidelines about promotions any further because her reputation within the company would be impacted.

55. In or about December 2002, the Defendant informed the ARD Department that Ms. Byra-Grzegoczyk was being put in charge of the Separations Group.

56. Plaintiff was a member of this group.

57. From September 2002 until March 31, 2005, the Plaintiff and Ms. Byra-Grzegoczyk were the only two women scientists who reported to Ms. Gao and the only two women scientists in the ARD Department at the Wallingford facility.

58. During the course of their employment, the Plaintiff and Ms. Byra-Grzegoczyk were subjected to unfair and unequal treatment based on their gender, including but not limited to:

    a. Having their work subjected to extra scrutiny;

    b. Being belittled and demeaned in front of co-workers; and

    c. Being treated in a manner less favorable than their male counterparts.

59. At the end of June, 2003, a meeting of the entire ARD Department was organized and conducted by Defendant's Human Resources Department.

60. During this meeting, a male employee, Tony Spears, complained that Ms. Gao treated female scientists different than male scientists.

PDF created with pdfFactory trial version www.pdffactory.com

61.     At this time, the only two female scientists in the ARD Department were the Plaintiff and Ms. Byra-Grzegoczyk.

62.     On September 4, 2003, Ms. Byra-Grzegoczyk formally complained to Ms. Gao's supervisor, Mr. DiDonato, and the Director of Analytical Research and Development, Mr. Klohr about Ms. Gao's harassment.

63.     Ms. Byra-Grzegoczyk also forwarded a copy of her complaint to the Vice President of ARD, Mark Powell.

64.     On November 24, 2003, Plaintiff wrote a letter to Mr. Powell expressing her concerns about Ms. Gao, the treatment that she was receiving and again seeking information on the criteria for advancement within the Defendant's company.

65.     Approximately two weeks later, the Plaintiff received an e-mail from Mr. Powell indicating that he had passed on her concerns to Steve Klohr.

66.     Thereafter, Mr. Klohr had a brief conversation with the Plaintiff concerning the issues she had raised.

67.     The Plaintiff, based on Mr. Klohr's apparent disinterest in her comments, eagerness to leave the Plaintiff's office at the earliest possible opportunity, and lack of possible solutions offered to remedy the situation, believes that this conversation was superficial and not intended to address the Plaintiff's actual concerns.

68.     On or about December 19, 2003, Plaintiff's supervisor, Ms. Byra-Grzegoczyk, completed her annual performance review and forwarded it to Ms. Gao.

69.     Ms. Byra-Grzegoczyk's review of the Plaintiff was positive.

70.     Ms. Byra-Grzegoczyk's review of the Plaintiff was changed without her input and approval, despite the fact that Ms. Byra-Grzegoczyk was the Plaintiff's direct supervisor.

PDF created with pdfFactory trial version www.pdffactory.com

71. Thereafter, Ms. Gao met with Ms. Byra-Grzegoczyk to discuss the Plaintiff's job performance.

72. Ms. Gao informed Ms. Byra-Grzegoczyk that she had questions about the Plaintiff's performance and that she wanted to speak with the Plaintiff directly.

73. Thereafter, Ms. Gao met with the Plaintiff and demanded specific answers from her about her job performance.

74. The Plaintiff answered all of Ms. Gao's questions.

75. Under the Defendant's policy, the performance reviews for Ms. Gao's subordinates were supposed to be finalized by January 31, 2004.

76. Although Ms. Gao had completed all of the performance reviews for her male subordinates, she had not finalized the reviews for the Plaintiff of Ms. Byra-Grzegoczyk.

77. The Plaintiff and Ms. Byra-Grzegoczyk were the only two female scientists under Ms. Gao's supervision.

78. On or about January 20, 2004, during a one-on-one meeting with Ms. Gao, Ms. Byra-Grzegoczyk was verbally abused and informed that her reputation within the company was poor.

79. During this abuse, Ms. Gao stated to Ms. Byra-Grzegoczyk "woman, I am talking to you; Qi is talking to you."

80. Immediately after this meeting, Ms. Byra-Grzegoczyk sent an e-mail to the Defendant's Human Resources Department informing them of the incident that had just transpired.

81. Ms. Byra-Grzegoczyk did not receive a response.

82. On or about January 30, 2004, Mr. Fritzsche, Director of Human Resources, met with Ms. Byra-Grzegoczyk to discuss her allegations.

PDF created with pdfFactory trial version www.pdffactory.com

83. On February 2, 2004, Mr. Fritzsche sent an e-mail to Ms. Byra-Grzegoczyk stating that, although there may have been some inconsistent and poor managerial behavior, Mr. Fritzsche concluded that no discrimination had occurred.

84. The criteria used by Mr. Fritzsche to make this determination, if any, were never disclosed.

85. On February 3, 2004, Ms. Byra-Grzegoczyk responded to Mr. Fritzsche's e-mail and reminded him that the Plaintiff and at least two other male co-workers had informed the Defendant's representatives, based on their observations, that they believed Ms. Gao treated male employees better than female employees.

86. On or about February 5, 2004, Mr. Fritzsche met with the Plaintiff to discuss what she had witnessed in relation to Ms. Byra-Grzegoczyk's allegations.

87. During this meeting, which lasted approximately 3 ½ hours, the Plaintiff confirmed Ms. Byra-Grzegoczyk's allegations and stated that she had fell victim to Ms. Gao's discrimination as well.

88. On or about February 8, 2004, as a result of the stress and suffering from the un-remedied discriminatory and retaliatory conduct, Ms. Byra-Grzegoczyk became severely ill and went out on short term disability leave.

89. Upon Ms. Byra-Grzegoczyk's departure, Ms. Gao became the Plaintiff's direct supervisor.

90. As the Plaintiff's direct supervisor, Ms. Gao's harassment of the Plaintiff increased.

91. The Plaintiff sent an e-mail to Mr. Fritzsche complaining about Ms. Gao's harassment.

92. On or about February 25, 2004, Mr. Fritzsche met with the Plaintiff to discuss the harassment to which Ms. Gao was subjecting her.

PDF created with pdfFactory trial version www.pdffactory.com

93.    Mr. Fritzsche took no action to remedy Ms. Gao's harassment of the Plaintiff.

94.    After receiving no assistance from Mr. Fritzsche, the Plaintiff sent an e-mail to Mr. Klohr
       complaining about Ms. Gao's harassment and asking Mr. Klohr to resolve the situation in
       an impartial manner.

95.    The Plaintiff also requested a meeting with the Head of ARD, Mr. Powell to inform him
       directly of the severity and seriousness of the situation and conveyed a sense of urgency
       for a rapid resolution.

96.    Mr. Powell, in what Plaintiff believes was an effort to distance himself from the situation,
       referred the Plaintiff back to Mr. Fritzsche and Mr. Klohr.

97.    On March 3, 2004, Mr. Fritzsche and Ms. Gao met with the Plaintiff to review her annual
       performance evaluation, which should have been finalized and submitted by the end of
       January.

98.    Plaintiff's original performance evaluation, which had been completed by Ms. Byra-
       Grzegoczyk, had been positive.

99.    However, when the performance review was submitted to Plaintiff, it had been changed
       to reflect negative comments from Mr. Klohr and Mr. DiDonato, neither of who had any
       direct involvement with the Plaintiff's daily scientific duties.

100.   When the Plaintiff stated that many of the negative comments about her were false and
       proceeded to give examples, Mr. Fritzsche yelled at her and told her to be quiet.

101.   Thereafter, due to her distress, Plaintiff requested that the meeting be adjourned and
       postponed to another time.

102.   Mr. Fritzsche informed Plaintiff that if she chose to leave the meeting it would be
       considered insubordination.

PDF created with pdfFactory trial version www.pdffactory.com

103.   Plaintiff was subjected to another hour of Mr. Fritzsche and Ms. Gao criticizing her about her performance before the meeting was adjourned.

104.   Upon returning to her office, Plaintiff began to cry uncontrollably and was unable to maintain composure for the remainder of the day.

105.   At approximately 4 p.m. on the same date, Mr. Fritzsche called Tony Spears into his office to discuss the meeting that had taken place between the Plaintiff and Ms. Gao the previous week.

106.   In this meeting, Mr. Fritzsche was informed that Mr. Spears felt that Ms. Gao treated the Plaintiff differently than she treated him.

107.   In making this assertion, Mr. Spears pointed out that responses to the same questions were less aggressive and derogatory when he asked them, and that Ms. Gao was always argumentative when addressed by the Plaintiff.

108.   At the end of March 2004, Defendant responded to the Plaintiff's complaints of harassment through Mr. Klohr and Mr. Fritzsche.

109.   Mr. Klohr and Mr. Fritzsche met with the Plaintiff in Mr. Fritzsche's office and informed her that the Defendant had concluded that no harassment had taken place.

110.   No explanation was given for their conclusion and no written summary of the investigation was ever provided.

111.   On or about April 2, 2004, Mr. Klohr met with the Plaintiff in Ms. Gao's office and in Ms. Gao's presence informed the Plaintiff in a very punitive manner that her performance did not meet the expectations that were set forth in her 2003 "Goals and Objectives."

112.   This was the first time in the Plaintiff's fifteen-year tenure with the company that her performance was allegedly unsatisfactory.

PDF created with pdfFactory trial version www.pdffactory.com

113. On May 2, 2004, while out on short-term disability, Ms. Byra-Grzegoczyk sent a letter to Defendant's Ombudsman, Sandra Holleran, reiterating the harassment to which she had been subjected and requested an objective, impartial review of the situation.

114. Ms. Holleran reported directly to the Chief Executive Officer, Peter Dolan.

115. On May 3, 2004, Ms. Byra-Grzegoczyk and the Plaintiff followed up Ms. Byra-Grzegoczyk's letter by initiating a conference call with Ms. Holleran.

116. During this conversation, the Plaintiff corroborated Ms. Byra-Grzegoczyk's complaints of harassment and expressed that she had been subjected to similar treatment.

117. On May 4, 2004, Defendant terminated Ms. Byra-Grzegoczyk's short-term disability benefits without notifying her.

118. On or about May 7, 2004, four days after the conference call with Ms. Holleran, Plaintiff submitted a tuition reimbursement form to Ms. Gao so that Plaintiff could attend summer courses towards her M.B.A.

119. As of May 7, 2004, Plaintiff had been reimbursed for the education expenses incurred in working towards receiving her M.B.A.

120. On May 11, 2004, Ms. Gao informed the Plaintiff that the Defendant would no longer be providing her with tuition reimbursements.

121. On or about May 13, 2004, Plaintiff informed Ms. Holleran, Defendant's Ombudsman and the Defendant's Director of Human Resources, Suzanne Parchment, that her request for tuition reimbursement had been denied.

122. Thereafter, the Plaintiff received a response from Mr. Klohr informing her that the tuition reimbursement had been denied because the Plaintiff had received a "does not meet expectations" evaluation.

PDF created with pdfFactory trial version www.pdffactory.com

123.    Plaintiff forwarded Mr. Klohr's response to Ms. Parchment.

124.    Ms. Parchment informed the Plaintiff that she could not reverse management's decision.

125.    On or about June 2, 2004, Ms. Byra-Grzegoczyk, in response to a letter from the Defendant notifying her that if she chose not to return to work by June 3, 2004 she would be terminated, returned from her disability leave against her physician's advice.

126.    During Ms. Byra-Grzegoczyk's absence, the Plaintiff had performed the majority of the work in the Separations Lab and believed, based on the scientific results, that she had done so successfully.

127.    Upon Ms. Byra-Grzegoczyk's return from short-term disability, Ms. Gao met with her in the presence of a Human Resources representative, Robyn Green-Geller, to conduct Ms. Byra-Grzegoczyk's performance evaluation for 2003.

128.    Ms. Gao incorporated inaccurate statements in Ms. Byra-Grzegoczyk's review in the same manner as she had done with the Plaintiff.

129.    Ms. Byra-Grzegoczyk provided a rebuttal to Ms. Green-Geller and Ms. Alvarez-Caldron, Defendant's Vice President of Human Resources, regarding the allegations and unfair performance evaluation but the contents of the evaluation remained unchanged.

130.    Thereafter, Ms. Gao pressured Ms. Byra-Grzegoczyk to work on the Plaintiff's six-month performance review.

131.    Although Ms. Byra-Grzegoczyk expressed a positive opinion of the Plaintiff's performance, Ms. Gao indicated she felt otherwise.

132.    Ms. Byra-Grzegoczyk's review of the Plaintiff was revised six (6) times by Ms. Gao before the review was finalized.

PDF created with pdfFactory trial version www.pdffactory.com

133. The seventh and final version of the Plaintiff's performance review was negative and was completely different from the sixth version that Ms. Byra-Grzegoczyk had submitted.

134. Ms. Gao, although she was no longer Plaintiff's direct supervisor, signed Plaintiff's final performance review herself.

135. In July 2004, after the Plaintiff and Ms. Byra-Grzegoczyk discussed the Plaintiff's negative evaluation, Ms. Byra-Grzegoczyk contacted the collaborators that provided feedback on the Plaintiff's evaluation and asked them for their opinion concerning Plaintiff's performance.

136. The collaborators indicated that they had nothing negative to report about the Plaintiff's performance.

137. In August of 2004, Plaintiff sent an e-mail to Mr. Klohr seeking permission to enroll in courses during the fall semester and seek tuition reimbursement.

138. Mr. Klohr responded that the Plaintiff would not be entitled to tuition reimbursement because she still was not fully performing.

139. Mr. Klohr also informed the Plaintiff that Ms. Gao could provide her with examples of her poor performance or non-performance if that were the case.

140. On September 1, 2004, Plaintiff met with Ms. Gao and requested examples of her alleged poor performance.

141. Ms. Gao was unable to provide the Plaintiff with specific examples, telling the Plaintiff that she was just the messenger and that the negative feedback had come from Mr. DiDonato and Mr. Klohr, neither of whom had any direst contact with or involvement in the Plaintiff's daily scientific duties.

14

PDF created with pdfFactory trial version www.pdffactory.com

142.   On September 3, 2004, Plaintiff spoke to the Associate Director of PR&D about her performance evaluation.

143.   The Director informed the Plaintiff that he did not have anything negative to say about her performance and that his comments had been given to Ms. Byra-Grzegoczyk.

144.   The Director also informed the Plaintiff that he had not spoke to Ms. Gao about the Plaintiff specifically, but had provided general comments about how to enhance collaborative efforts between his group and ARD.

145.   During the same time period, Plaintiff actively looked for alternative employment options and was interviewed for two positions within the Defendant's company.

146.   Mr. Klohr, Ms. Gao and Mr. Fritzsche, as a retaliatory measure, prevented the Plaintiff from transferring to another department.

147.   Additionally, although from 2000 to 2004, Plaintiff consistently expressed a desire to be promoted or to have their positions upgraded, the Defendant company failed to do so.

148.   Nevertheless, during the same time period, several similarly situated male colleagues in the department were either promoted or had their positions upgraded by Ms. Gao or Mr. Klohr and approved by the Vice President of ARD, Mr. Powell.

149.   Many of these male colleagues were less senior within the Defendant's organization than the Plaintiff.

150.   After Ms. Gao became the manager of the Plaintiff's group, in a period of two and a half years, she promoted three males and recommended four of the five males within the group for departmental awards.

151.   The females within the group were not afforded the same opportunities.

15

PDF created with pdfFactory trial version www.pdffactory.com

152.   On October 4, 2004, Plaintiff sent an e-mail to Mr. DiDonato and Mr. Klohr requesting specific examples of her alleged poor performance.

153.   On October 5, 2004, Plaintiff filed an official complaint with Defendant's Ombudsman alleging discrimination and retaliation by Ms. Gao Mr. DiDonato and Mr. Klohr.

154.   Thereafter, Ms. Gao and the Defendant continued to subject the Plaintiff and Ms. Byra-Grzegoczyk to discriminatory and retaliatory treatment, including but not limited to differential treatment compared to similarly situated male employees.

155.   On November 30, 2004, due to the continued discrimination and retaliatory treatment, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

156.   By January 31, 2005 as per company policy, the performance evaluation forms of all the mail scientists had been reviewed, discussed and finalized by Ms. Gao.

157.   Ms. Byra-Grzegoczyk and the Plaintiff, the only two female scientists in the group, did not have their evaluation completed by this date.

158.   In addition, the Plaintiff and Ms. Byra-Grzegoczyk were the only two members of the group whose performance evaluations were conducted in the presence of a Human Resources representative.

159.   In her fifteen year tenure with the Defendant, the Plaintiff had never experienced firsthand or heard of any employee's performance evaluation being conducted in the office of the Director of Human Resources, Mr. Fritzsche.

160.   On January 31, 2005, the date that the Plaintiff's final performance evaluation was due under Defendant's own policies for 2004, Defendant submitted its answer to her complaint to the Connecticut Commission on Human Rights and Opportunities.

PDF created with pdfFactory trial version www.pdffactory.com

161.   In March 2005, Plaintiff received her third negative performance evaluation from Ms. Gao.  The Plaintiff's original performance evaluation completed by her direct supervisor, Ms. Byra-Grzegoczyk, was completely ignored and replaced by a negative performance evaluation written by Ms. Gao, Mr. Didonato and Mr. Klohr who had no daily professional interaction with the Plaintiff.  Both Mr. Klohr and Mr. Didonato work at the facility in New Brunswick and New Jersey.

162.   On March 18, 2005, Plaintiff sent an e-mail to Mr. Klohr and Mr. Powell complaining that her latest negative evaluation was in retaliation for her complaints of discrimination on behalf of herself and others.

163.   On March 30, 2005, Plaintiff wrote a detailed rebuttal to her negative performance evaluations.

164.   Plaintiff's rebuttal recounted some of the history relating to her prior complaints of discrimination.

165.   On March 31, 2005, Plaintiff and Ms. Byra-Grzegoczyk were both terminated purportedly due to a "lack of work."

166.   Plaintiff and Ms. Byra-Grzegoczyk were each given one-hour to clean out their desks.

167.   The Plaintiff amended her complaint to the Connecticut Commission on Human Rights and Opportunities alleging retaliation in the form of her termination for having complained of illegal discriminatory practices, including her filing of her complaint with the Commission.

168.   Prior to the final walk-out from the Defendant's facility, escorted by security personnel, the Plaintiff and Ms. Byra-Grzegoczyk independently informed the CEO, Peter Dolan by email, of the inappropriate conduct of the ARD managers and the unexpected

PDF created with pdfFactory trial version www.pdffactory.com

termination. Mr. Dolan was simultaneously notified that the Defendant's policy on discrimination and harassment had been violated.

169.   On April 4, 2005, the Plaintiff sent a letter to Peter Dolan, CEO, explaining the discrimination and retaliation to which she had been subjected by Ms. Gao, Mr. Klohr, Mr. Didonato, Mr. Powell and Mr. Fritzsche.

**Count One:   Gender Discrimination in Violation of Title VII, 42 U.S.C. § 2000e, *et. seq.***

170.   Paragraphs 1 through 169 are hereby reincorporated by reference in this the First Count the same as if fully pled herein.

171.   During the course of her employment with the Defendant company, Plaintiff was subjected to an ongoing and continued pattern of discrimination, including but not limited to:

      a.   Failure or refusal to promote or upgrade;

      b.   Being subjected to unfair and unequal treatment relative to her male co-workers;

      c.   Being subjected to undue scrutiny and harassment; and

      d.   Being terminated.

172.   Plaintiff's gender was a factor, which made a difference in Defendant's treatment of her in violation of Title VII.

173.   As a result of Defendant's discriminatory treatment, Plaintiff has suffered and will continue to suffer economic and emotional harm.

**Count Two:   Gender Discrimination in Violation of Conn. Gen. Stat. § 46a-60(a)(4)**

174.   Paragraphs 1 through 169 are hereby reincorporated by reference in this the Second Count the same as if fully pled herein.

PDF created with pdfFactory trial version www.pdffactory.com

175. During the course of her employment with the Defendant company, Plaintiff was subjected to an ongoing and continued pattern of discrimination, including but not limited to:

    a.  Failure or refusal to promote or upgrade;

    b.  Being subjected to unfair and unequal treatment relative to her male co-workers;

    c.  Being subjected to undue scrutiny and harassment; and

    d.  Being terminated.

176. Plaintiff's gender was a factor, which made a difference in Defendant's treatment of her in violation of Conn. Gen. Stat. § 46a-60(a)(4).

177. As a result of Defendant's discriminatory treatment, Plaintiff has suffered and will continue to suffer economic and emotional harm.

**Count Three:**       **<u>Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et. seq.*</u>**

178. Paragraphs 1 through 169 are hereby reincorporated by reference in this the Third Count the same as if fully pled herein

179. During the course of her employment, Plaintiff engaged in protected activities within the meaning of Title VII.

180. Plaintiff made good faith complaints of discrimination on behalf of herself as well as other employees.

181. The Plaintiff also served as a witness for other employees who made discrimination complaints against the Defendant.

182. The Defendant was aware that Plaintiff had engaged in protective activities.

183. The Plaintiff suffered retaliation as a result of her protected activities, including but not limited to:

PDF created with pdfFactory trial version www.pdffactory.com

    a.  Hostile and disparate treatment;

    b.  Termination; and

    c.  Defendant's subsequent refusal to provide reference information to potential employers despite the fact that Defendant typically provides such information.

184.   As a result of Defendant's retaliatory treatment, Plaintiff has suffered and will continue to suffer economic and emotional harm.

**Count Four:**      **<u>Retaliation in Violation of Conn. Gen. Stat. § 46a-60(a)(4)</u>**

185.   Paragraphs 1 through 169 are hereby reincorporated by reference in this the Fourth Count the same as if fully pled herein

186.   During the course of her employment, Plaintiff engaged in protected activities within the meaning of Conn. Gen. Stat. § 46a-60(a)(4).

187.   Plaintiff made good faith complaints of discrimination on behalf of herself as well as other employees.

188.   The Plaintiff also served as a witness for other employees who made discrimination complaints against the Defendant.

189.   The Defendant was aware that Plaintiff had engaged in protective activities.

190.   The Plaintiff suffered retaliation as a result of her protected activities, including but not limited to:

    a.  Hostile and disparate treatment;

    b.  Termination; and

    c.  Defendant's subsequent refusal to provide reference information to potential employers despite the fact that Defendant typically provides such information.

PDF created with pdfFactory trial version www.pdffactory.com

191.    As a result of Defendant's retaliatory treatment, Plaintiff has suffered and will continue to suffer economic and emotional harm.

**Count Five:   <u>Promissory Estoppel</u>**

192.    Paragraphs 1 through 169 are hereby reincorporated by reference in this the Fifth Count the same as if fully pled herein.

193.    At all times relevant hereto, the Defendant maintained a written policy, which prohibits "retaliation against any individual who, in good faith, reports discrimination or harassment or participates in an investigation of such reports."

194.    Defendant's policy was signed by the Defendant's Chief Executive Officer.

195.    Defendant's written policy constituted a clear and definite promise that the Defendant and its agents would not retaliate against employees who made good faith complaints of discrimination.

196.    Plaintiff reasonably relied upon Defendant's promise in making good faith complaints of discrimination and by participating in the investigation of discrimination complaints by other employees.

197.    Plaintiff's reliance was detrimental insofar as the Defendant and its agents retaliated against the Plaintiff, by:

    a.   Failing or refusing to promote or upgrade her;

    b.   Subjecting her to unfair and unequal treatment relative to her male co-workers;

    c.   Subjecting her to undue scrutiny and harassment; and

    d.   Terminating her after her participation in reporting and supporting complaints of discrimination.

PDF created with pdfFactory trial version www.pdffactory.com

198.   As a result of Defendant's breach, the Plaintiff has suffered and will continue to suffer emotional and economic damage.

**Count Six:**      **Defamation**

199.   Paragraphs 1 through 169 are hereby reincorporated by reference in this the Sixth Count the same as if fully pled herein.

200.   During the course of Plaintiff's employment, Defendant's agents published false statements concerning Plaintiff's job performance to Plaintiff's co-workers and managers.

201.   These false statements prevented Plaintiff from transferring out of the ARD Department.

202.   The false statements were harmful to Plaintiff's reputation.

203.   Following Plaintiff's termination, the Defendant, by and through its agents, published false statements about Plaintiff and her job performance to prospective employers.

204.   Such false statements were harmful to Plaintiff's reputation.

205.   As a result of Defendant's defamatory statements, Plaintiff suffered and continues to suffer in the form of lost opportunities and emotional harm.

**Count Seven:**        **Intentional Infliction of Emotional Distress**

206.   Paragraphs 1 through 169 are hereby reincorporated by reference in this the Seventh Count the same as if fully pled herein.

207.   The Defendant, by and through its agents, harassed and discriminated against the Plaintiff and retaliated against her for complaining of such treatment.

208.   The Defendant's conduct was extreme and outrageous.

209.   The Defendant knew or should have known that its conduct was likely to cause Plaintiff emotional distress.

PDF created with pdfFactory trial version www.pdffactory.com

210.    As a result of Defendant's conduct, Plaintiff suffered severe emotional distress.

PDF created with pdfFactory trial version www.pdffactory.com

**WHEREFORE**, the Plaintiff respectfully prays this Court to take jurisdiction over her case and to:

1.  Issue a declaratory judgment with respect to each Plaintiff that the Defendant violated 42 U.S.C. § 2000 *et. seq.*;

2.  Award Plaintiff the economic damages she has suffered to date and which she will continue to suffer in the future, including lost pay and benefits;

3.  Award Plaintiff compensatory and punitive damages under 42 U.S.C. § 2000 *et. seq.* and Conn. Gen. Stat. § 46a-60, *et. seq.*;

4.  Order the Defendant to reimburse the Plaintiff for the reasonable attorney's fees and costs she incurred in prosecuting Counts One, Two, Three, Four and Five;

5.  Award Plaintiff economic and compensatory damages for the harm suffered under Counts Five and Six;

6.  Award Plaintiff interest on her lost economic damages, pursuant to Conn. Gen. Stat. § 37-3a; and

7.  Award Plaintiff such other equitable relief as the Court deems appropriate.


THE PLAINTIFF,
SADIA ABID


By: _____
Eugene N. Axelrod, Esq.
Juris No. ct00309
Jill E. Alward, Esq.
Juris No. ct27051
The Employment Law Group, LLC.
8 Lunar Drive
Woodbridge, CT 06525
203-389-6526
203-389-2656

PDF created with pdfFactory trial version www.pdffactory.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SADIA ABID, | : | CIVIL ACTION NO.: |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BRISTOL-MYERS SQUIBB CO., | : | |
| Defendant. | : | JULY 6, 2006 |

## JURY TRIAL CLAIM

The Plaintiff, Sadia Abid, claims a trial by jury on all claims triable by jury.


THE PLAINTIFF,
SADIA ABID


By: _____
Eugene N. Axelrod, Esq.
Juris No. ct00309
Jill E. Alward, Esq.
Juris No. ct27051
The Employment Law Group, LLC.
8 Lunar Drive
Woodbridge, CT 06525
203-389-6526
203-389-2656

PDF created with pdfFactory trial version www.pdffactory.com